**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

MICHELLE CASH PLAINTIFF

v. No. 5:06CV00292 JLH

SOCIAL SECURITY ADMINISTRATION DEFENDANT

**OPINION**

Michelle Cash has appealed the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for Disability Insurance Benefits and Supplemental Security Income payments. The parties have submitted their appeal briefs, and the issues are now joined and ready for decision.

**I.**

Cash has the burden of proving her disability by establishing a physical or mental impairment lasting at least one year that prevents her from engaging in any substantial gainful activity. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Baker v. Apfel*, 159 F.3d 1140, 1143 (8th Cir. 1998); *Ingram v. Chater*, 107 F.3d 598, 601 (8th Cir. 1997). The Commissioner found that she is not disabled. The Court's function on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.

> Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. In determining whether existing evidence is substantial, we consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because we would have decided the case differently.

*Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir. 2000) (citations omitted).

**II.**

On October 31, 2002, Cash filed an application for Disability Insurance Benefits and Supplemental Security Income payments. She alleged that she became disabled on October 17, 2000, due to obesity and carpal tunnel syndrome of her left hand (Tr. 54.) Cash's counsel amended the alleged onset date to May 25, 2002, at the hearing (Tr. 168). Cash met the special earnings requirements for Disability Insurance Benefits through June 30, 2002 (Tr. 12, 58, 167). Her claims were denied initially and upon reconsideration (Tr. 36-37, 43). Pursuant to Cash's request, a hearing was conducted by the administrative law judge on July 13, 2004 (Tr. 165), on her claims of obesity, carpal tunnel syndrome of her left hand, hypertension, and back problems (Tr. 13, 85). Also present and testifying were Bernice Howard, Cash's mother-in-law, and Ken Waits, M.S., a vocational expert.

Cash was born on February 19, 1972, and was 32 years old on the date of the ALJ's decision, August 12, 2004 (Tr. 9, 13, 22, 169). She dropped out of school, where she was in regular, not special education, classes, during the second semester of tenth grade. She obtained her GED about two years later (Tr. 13, 170). Cash has past relevant work experience as a surveillance systems/alarm systems monitor,[1] a convenience store-retail clerk, and a daycare-caregiver worker (Tr. 13, 86, 174-175, 183-185).

Cash testified at the hearing that the carpal tunnel syndrome in her left arm had been bothering her since approximately March of 2001 and that Dr. Clyde Paulk had given her the brace that she wears all the time, except when bathing. The brace has reduced the pain (Tr. 170-171, 189).

---

[1] This designation will be discussed in more detail in the context of past relevant work later in this opinion.

She is 5'5" and weighs more than 350 pounds. The maximum weight that her doctor's scales can record is 350 pounds (Tr. 171). Cash gained over 100 pounds since 1998, which caused additional problems for her legs (Tr. 187-188). Her body mass index is greater than 50, and her weight keeps her from bending or stooping (Tr. 180-181). Cash stated that she can only stand 10 to15 minutes before she begins to suffer major pain and can stand an extra 10 minutes with excruciating pain (Tr. 176). She testified that she could sit without her feet propped up for maybe an hour before she would experience excruciating pain and that she could not walk two blocks (Tr. 176). Cash stated that during a typical day she elevates her feet 90% of the time to prevent them from swelling to the size of a cantaloupe (Tr. 181). She denied the ability to do anything with her left arm. She stated that she could pick up 10 or 20 pounds with her right arm if she needed to but could not frequently pick up to 10 pounds up to two-thirds of a workday (Tr. 177, 190).

Cash testified that she normally gets up around 8:00 to 8:30 a.m. and makes her children a bowl of cereal or some Eggo waffles (Tr. 181). She sits in her chair and watches TV or watches them watch cartoons (Tr. 181-182). They also will play flash cards, sing, play games, or nap and she tries, at least every other day, to go outside with them so the children can play for 15 or 20 minutes (Tr. 181-182). Cash starts preparing a supper – usually Hamburger Helper, chicken nuggets, French fries, beef stew – around 4:30 p.m. so it will be ready when her husband arrives home at 5:00 p.m. (Tr. 177, 182, 186). She testified that her back and acid reflux hurt her all night so she never has a good night's sleep (Tr. 182, 187). Cash stated that Howard helps her out with the vacuuming and mopping and also does her clothes and dishes (Tr. 177).

Cash testified that some of the medicines that she has taken for her pain since February of 2002 have alleviated it quite a bit (Tr. 178). She takes Soma, a muscle relaxer, three times a day.

The Soma makes her a little sleepy (Tr. 178). She has been prescribed Paxil a couple of times. She stated that her weight and her not being able to function were "kind of depressing." In addition, she had suffered somewhat with postpartum depression after the birth of her children (Tr. 178-179). Cash formerly took Prilosec for her reflux problems, but now she usually takes an over-the-counter acid reducer as she is not currently able to afford the Prilosec (Tr. 179). She takes Aleve or Ibuprofen for pain (Tr. 179).

In addition to her brief testimony about her experience at jobs of data entry, convenience store, and day care, Cash testified more at length about her employment from February 1997 to June 1998 (Tr. 173, 183-186). She was a monitor at Rock Safe Company, a security company, where she would sit at a computer and, when an alarm would sound, a number would appear on the computer, at which time she would call for a correct pass code. If she did not receive a correct pass code, she would call the police (Tr. 183). She would also have to fill boxes on a form when new people were added and write the reason an alarm went off, as well as filing all new accounts or changes (Tr. 204-206). Cash stated that she averaged 30 alarms during an 8-hour period, with each one taking around 15 minutes to work up, although there could be 200 alarms all at once if thunder, lightening or electricity made the alarms sound, an event that could be very stressful (Tr. 184-185, 206-207). Cash testified that there were nice chairs so she could sit and the company was very lax about sitting or standing (Tr. 184). She was free to get up, move around, stretch, go to the rest room, or get a drink between calls, but she would need to sit down to make entries with the keyboard (Tr. 207).

Howard testified that she lives about a half a block from Cash and is at her trailer every day (Tr. 177, 191, 193). She agreed that Cash suffered to the extent that Cash testified and that Cash has to put her feet up most of the time due to swelling (Tr. 191-193). Howard added that Cash cannot

wear tennis shoes or anything comparable since her feet will swell out over them (Tr. 193). She stated that Cash has difficulty getting up and down out of a chair and has gained a lot of weight since her marriage (Tr. 192).

Waits testified that he had reviewed the pertinent portions of Cash's file and had been present throughout the hearing (Tr. 193-194). He classified her positions as data entry clerk, cashier job with some stocking, and babysitting. Waits characterized her past relevant work for the monitor job as surveillance system monitor, which was the best category he could find. That category was not a perfect fit, because it was based on observing screens where cameras are taking a picture and so would be sedentary physical demand, SVP two, unskilled (Tr. 194). "Special Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Appendix C of the DICTIONARY OF OCCUPATIONAL TITLES (DOT). Level 2 is "[a]nything beyond short demonstration up to and including 1 month." *Id*.

The ALJ posed a hypothetical to Waits. He assumed an individual with a 10th grade education plus a GED that has the same past relevant work as Cash, who had the ability to sit for 6 hours out of an 8-hour day, stand and walk 2 hours out of an 8-hour day, who could occasionally bend and stoop, but who was unable to perform constant repetitive movements with the non-dominant upper extremity. The ALJ asked whether the individual he described in the hypothetical could return to any of Cash's past relevant work (Tr. 194-195). Waits responded that the surveillance system monitor would fit the profile (Tr. 195). When the ALJ added to the hypothetical that the individual would have to alternate sitting and standing every 15 minutes, Waits stated that he believed it could be alternated although the individual might have to bend over to operate the

computer (Tr. 195-196). He stated that he was basing his answer as to Cash's past relevant work on his knowledge of the job as a vocational expert (Tr. 197). Cash's attorney added to the hypothetical that the individual could stand only one hour and would be seated the rest of the time. Waits responded that such a restriction would not erode the occupational base for being able to do the job of surveillance system monitor (Tr. 200-201).

Upon further questioning of Cash by the ALJ, it was clarified that she needed to sit down when it came time to make the entries and she was heavier now (Tr. 207). Based on the additional information developed, Waits opined that if she absolutely had to alternate sitting and standing every 15 minutes, there would be periods when she could not alternate to sit and operate the computer and, with being unable to tolerate stooping over, she could not do the job (Tr. 208).

After her attorney stated that if surveillance system monitor was not her past relevant work then there would be very few of those jobs in Arkansas, the following exchange occurred:

> ALJ: – let's just cut to the chase here and we can all quit dancing around with it. Mr. Waits, as I understand it, the job she did for the Rock Safe Company you have more or less – I think we pretty much all agree she was not a surveillance system monitor –
>
> CLMT: Just my [INAUDIBLE] –
>
> ALJ: – she was an alarm monitor. Right? I mean –
>
> VE: Yes.
>
> RE-EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:
>
> Q: – you can't pigeonhole that to try to put that in the, to put what she did into the surveillance system monitor description in the DOT is trying to put the [INAUDIBLE] square peg in the round hole. It ain't there.
>
> A: That's correct.

Q: Is that right?

A: That's correct. It's not –

Q: And what I'm –

A: – best –

Q: – talking about is the job she did, not some abstract job listed in the DOT which, you know, I understand and I accept that the DOT is still the governing thing. But I also understand and accept that it's been almost totally discredited by everybody except the government. Is that not a fair statement?

A: Well, it's inadequate, I'll certainly admit to that.

Q: All right. Well, it's out of date at best.

A: Yes, sir, it is.

Q: But yet we're stuck with it and I certainly understand and acknowledge that. What I'm talking about is the job she did not some abstract job in the – I take – this is not secret, I've told it to a lot of people, I've probably told it to Mr. Nussbaum, I don't like vocational expert testimony that somebody can be a surveillance system monitor unless it's somebody who's done that type work before. I mean I can't – I could launch into the rant on that which I'm going to spare all of you. But I don't like that but here is this nice lady is, I think we all agree, she didn't do the job the way it's listed in the DOT. Right?

A: Right.

Q: We're all together on that.

A: That's right.

Q: And so, as far [as] I'm concerned, the DOT is out. What I want to know is, given the limitations that I set out, could she do the job as she did it? That's the first thing I've got to deal with. Now am I on track, Mr. Nussbaum?

ATTY: Oh, yes, I understand, you are on track –

ALJ: Okay.

ATTY: – as she performed the job.

BY ADMINISTRATIVE LAW JUDGE:

Q: All right. As she did it.

A: I'm going to say, no, as she did it.

Q: Why not?

A: Because of the requirement of alternating and standing every 15 minutes I think it would be difficult for her to do that job at certain times. You know, there would be times where it would work real well.

Q: All right, that's hypothetical number two where I put the alternate sitting and standing every 15 minutes. Hypothetical number one – okay. All right, so we'll change your answer to hypothetical number two is no. Hypothetical number one was basically the standard sedentary sit six hours out of an eight hour day. Stand and walk two hours out of an eight hour day. Lift, carry, 10 pounds occasionally. Can only occasionally bend or stoop and cannot perform constant repetitive movements with the non dominant upper extremity. That was hypothetical number one. Now could such a person do that job as Ms. Cash did it?

A: Yes, Your Honor.

ALJ: Okay. All right. Now, Mr. Nussbaum, I think we've hashed and rehashed this thing about as much as we can. I've tried to simplify it and tried to draw it into focus which I may not have so if you have anything that you – I'm not trying to cut you off –

ATTY: No.

ALJ: – but I've tried to get it into focus as best I can and get us off this DOT tangent.

ATTY: Okay. The only thing I have to go on, Your Honor, to drop on is the DOT and I think I know the answer to this but I want to make certain.

ALJ: All right.

ATTY: In the clerical jobs, as they're defined by the DOT, don't you need good use of your hands, not your hand, both your hands in a clerical setting like she worked in?

VE: Yes.

ATTY: Okay, nothing further.

(Tr. 207-212).

**III.**

The ALJ undertook the familiar five-step analysis in determining whether Cash was disabled. The five-step sequential evaluation determines: (1) whether the claimant is currently employed; (2) whether the claimant is severely impaired; (3) whether the impairment is, or is comparable to, a listed impairment; (4) whether the claimant can perform past relevant work; and if not (5) whether the claimant can perform any other kind of work. *Cox v. Barnhart*, 345 F.3d 606, 608 n.1 (8th Cir. 2003).

The ALJ found that Cash had not engaged in substantial gainful activity since the alleged onset of disability (Tr. 13, 21). The ALJ further found that Cash has a history of medically determinable impairments associated with acute low back strain, gastroesophageal reflux disease, carpal tunnel syndrome (left), hypertension and morbid obesity, a history of pedal edema, and a history of early degenerative joint disease of the knees which are considered "severe," but that she does not have a listed impairment. He also found that her alleged depression and anxiety was not severe or was situational because it required only very brief periods of oral medication to control symptoms and would have no more than a minimal impact on Cash's ability to perform basic work activities (Tr. 16-17).

The ALJ evaluated Cash's subjective allegations and complaints pursuant to the criteria set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). These include the claimant's prior work record, as well as observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain;

(3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; (5) other treatments for relief of pain; and (6) functional restrictions. The ALJ found that, despite Cash reporting chronic and severe pain, she was not currently using prescription pain medication; she testified that she kept her legs and feet elevated "90% of the time"; she described her work as a monitor of alarm systems as receiving, on an average day, 30 alarms in an 8-hour period; she discontinued her work in 1998 as a monitor because she had a sick child and needed day work, not because she was physically unable to perform the work (Tr. 202-203); Howard's testimony appeared to be based on an uncritical acceptance of Cash's complaints and a potential desire to see her receive benefits and was not supported by the substantial medical evidence in the record; Cash has never been advised by any treating or examining physician of symptoms or impairments that she could not engage in substantial gainful activity or that she had any permanent functional restrictions; her treating physician, Dr. Paulk, did not indicate in any way that she was precluded from work activity at every exertional level or place her under permanent physical restrictions; Cash had some degree of failure to maintain regular follow-up due to a "lot of stress at home – lot of responsibility"; and she had complained of foot swelling due to being on her feet "a lot" – showing inconsistency and absence of medical evidence (Tr. 17-19, 22).

The ALJ found that Cash has retained the residual functional capacity to lift-carry and push-pull up to10 pounds occasionally, with the ability to sit 6 hours in an 8-hour workday and the ability to stand, walk, or both up to 2 hours in an 8-hour workday with the additional ability to occasionally bend or stoop. The ALJ found that Cash is precluded from constant, repetitive movement with the non-dominant (left) upper extremity (Tr. 20, 22). The ALJ further found that Cash's past relevant work as a surveillance system monitor did not require the performance of work-related activities

precluded by her residual functional capacity and so did not prevent her from performing her past relevant work (Tr. 21-22). Therefore, the ALJ found Cash not to be disabled (Tr. 22).

Cash requested review of the ALJ's decision (Tr.162-164). The Appeals Council denied her request for review on September 13, 2006 (Tr. 5). Cash then filed this action on November 13, 2006, pursuant to 42 U.S.C. § 405(g).

**IV.**

Cash contends that the ALJ erred in failing to develop the record properly because his decision that she can perform her past work as a surveillance system monitor at step 4 of the sequential evaluation is internally inconsistent with his finding during the oral testimony that she was not a surveillance system monitor but an alarm monitor. She argues that she was deprived of a meaningful opportunity to properly cross-examine Waits. She also argues that the ALJ failed to consider properly her morbid obesity pursuant to SSR 2-01 which requires a careful analysis of the impact morbid obesity would have upon the Cash's mental or physical capacity to perform substantial gainful activity. Cash further asserts that the ALJ did not determine her proper occupational base or her eligibility for benefits as Dr. Ralph Izard's January 2, 2003, findings shed little light on what restrictions she would have in performing her past work at step 4 or even step 5 of the sequential evaluation. She continues that the ALJ erred in failing to consider and include a diagnosis of borderline intellectual functioning as a severe impairment at step 2 and that he also failed to conduct a psychiatric review technique analysis. Finally, Cash argues that both the questioning of and hypothetical question to Waits were flawed as Waits was unclear about how properly to assess Cash's past work as an alarm tech or as a surveillance system monitor.

The ALJ's written opinion reflected a review of the medical records. Cash was seen by Dr. Paulk from September 5, 2001 through June of 2004. On her initial visit on September 5, 2001, Cash complained of week-long low back pain from cleaning house. She weighed 333.5 pounds; she was diagnosed with acute low back strain and gastroesophageal reflux disease (Tr. 14, 114). She was next seen on October 10, 2001, complaining of pain and numbness in her left hand with symptoms of fatigue and continued back pain. She weighed 340 pounds and was diagnosed with low back strain and carpal tunnel syndrome. Dr. Paulk prescribed Soma and the use of a left wrist splint (Tr. 14, 112-113). Cash reported that she was doing better on her October 25, 2001, visit. The splint was helping, although her left elbow had been hurting. Dr. Paulk assigned "codable diagnoses/symptoms" of left carpal tunnel syndrome, hypertension, morbid obesity, and a "rule out" diagnosis of depression and anxiety. He prescribed Soma, Diovan for hypertension, and Paxil (Tr. 14, 110-111).

Although not discussed in the ALJ's opinion, Cash had a follow-up visit on November 14, 2001, with diagnoses of hypertension, left carpal tunnel syndrome, obesity, and depression. Cash was prescribed Diovan and Paxil (Tr. 108).

On March 15, 2002, Cash complained of being unable to stand for more than a few minutes without severe pain in the lower back and drowsiness caused by the Paxil (Tr. 14-15, 106) Dr. Paulk diagnosed morbid obesity, back pain secondary to the obesity, and hypertension. He prescribed Adipex for weight loss, Arthorotec for pain relief, and an increase of Diovan (Tr. 15, 106). On March 29, 2002, Dr. Paulk diagnosed morbid obesity and prescribed a refill of Adipex (Tr. 15, 104).

Cash was seen by Dr. Paulk on April 16, 2002, at which time she had lost 12 pounds and claimed tenderness in the lumbo-sacral spine (Tr. 15, 102-103). She was diagnosed with morbid

obesity, benign hypertension, and gastroesophageal reflux disease. The medications noted were Diovan, Adipex, Soma, and Nexium (Tr. 15, 102).

On September 30, 2002, Cash requested to get back on the Adipex. She explained that she was unable to get in for a follow-up due to a lot of stress and responsibility at home (Tr. 15, 100). She was diagnosed with morbid obesity and hypertension. Dr. Paulk prescribed Diovan, Soma, Adipex, and Zantac (Tr. 15, 100). There was also a notation from the exam of left pedal edema (Tr. 101).

Cash was next seen by Dr. Paulk over a year later on November 13, 2003, complaining of a lump in her right breast and swelling of her left foot when she is up on it a lot with both feet swelling at times (Tr. 15, 134). She was diagnosed with a mass in the right breast and pedal edema and was prescribed Hydrochlorothiazide along with Diovan (Tr. 15, 134). The November 17, 2003, bilateral diagnostic mammogram and ultrasound were both negative (Tr. 15, 156).

On January 6, 2004, Cash visited Dr. Paulk for an abscessed tooth for which she received prescriptions; her only current medication was recorded as Diovan (Tr. 15, 132).

The final medical record by Dr. Paulk is for June 29, 2004, when Cash complained that she was unable to function and to work and she needed a slip for Social Security Disability (Tr. 158). Her complaints were of back and knee pain as well as swelling of the ankles. She reported tenderness related to the knees and an inability to squat more than approximately 6 inches from an upright position (Tr. 15, 159). Dr. Paulk diagnosed Cash with early degenerative joint disease of the knees, hypertension, morbid obesity, carpal tunnel syndrome and dental abscess. At the time, Cash was taking Aleve, Tylenol, Ibuprofen, and Diovan. An antibiotic was added to those medications (Tr. 15, 158).

On July 13, 2004, Dr. Paulk wrote a letter regarding Cash addressed "To Whom It May Concern" that stated:

> Ms. Cash has been a patient of mine since September 2001. Her diagnoses include morbid obesity, hypertension, carpal tunnel syndrome, pedal edema and early degenerate joint disease of her knees. She takes Diovan for her hypertension and wears a wrist splint for carpal tunnel syndrome.

(Tr. 157).

Cash was seen by Dr. Izard on January 2, 2003, for a consultative examination (Tr. 16, 116). Her alleged impairments were obesity, carpal tunnel syndrome, high blood pressure, and back problems. She reported her medications as Diovan, Soma and Ranitidine for the reflux (Tr. 16, 116). Cash weighed 345 pounds (Tr. 16, 118). She had normal range of motion to the cervical and lumbar spine; no muscle spasm; normal straight-leg raising; normal range of motion in shoulders, elbows, wrists, hands, hips, and knees; ankles with no heat, swelling, and tenderness; no muscle weakness or atrophy; normal gait and coordination as well as heel-toe walk; ability to stand and walk without an assistive device; and no edema (Tr. 16, 119-121). X-rays showed a moderate loss of joint space medially in the right knee with joint spaces maintained in the left ankle (Tr. 16, 121). Dr. Izard diagnosed Cash with degenerative arthritis of the knees, hypertension and reflux esophagitis. She stated that she would have moderate problems walking and standing due to her knees (Tr. 16, 122).

The Commissioner correctly points out that Cash did not allege borderline intellectual functioning as a disabling impairment in her applications or at the hearing, *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001), and that the only support she offers for this alleged impairment is a page of her junior and senior high school transcript – which does not include any such medical

diagnosis.[2] *Brown v. Shalala*, 15 F.3d 97, 99 (8th Cir. 1994) ("Under both the statute and the applicable regulations, the clinical and laboratory techniques used to arrive at a diagnosis must be 'medically acceptable.'"). The Commissioner further observed that Cash earned a GED, did not take any special education courses in school, performed semi-skilled occupations, and operated both a cash register and a computer. Thus, there is nothing in the record to support a claim that Cash had an impairment of borderline intellectual functioning.

Similarly, the Court cannot find that the ALJ erred in failing to conduct a psychiatric review technique analysis. Although Cash's medical records do show a "rule out" diagnosis of depression and anxiety and a prescription for Paxil on October 25, 2001, as well as a diagnosis of depression with medication of Paxil on November 14, 2001, the only other mention is in the March 15, 2002, report that Cash complained that the Paxil caused drowsiness. Paxil appears only once – December 20, 2001 – on the pharmacy print-out. Dr. Paulk's "to whom it may concern" letter of June 29, 2004, did not mention depression. "The mere fact that [plaintiff] has been prescribed antidepressants on at least one occasion is not enough to require the ALJ to inquire further into the condition by ordering a psychological evaluation." *Hensley v. Barnhart*, 352 F.3d 353, 357 (8th Cir. 2003).

Cash testified that her weight and her not being able to function were "kind of depressing" and that she had suffered a little with postpartum depression after the birth of her children. She has not claimed that her symptoms interfered with her ability to perform work-related activities. Based on the record, the ALJ properly concluded that her alleged depression and anxiety were not severe, were situational, or only required very brief periods of oral medication to control symptoms which

---

[2] The Court notes that the first semester of the ninth grade reflects grades of one "B"and two "C"s as well as one "D" and some "F"s. She had one "B" the second semester out of the remaining "F"s (Tr. 99).

would have no more than a minimal impact on Cash's ability to perform basic work activities. In *Matthews v. Bowen*, 879 F.2d 422 (8th Cir. 1989), the court explained:

> The ALJ found that Matthews suffered from mild situational depression but that this impairment was not severe enough to preclude her from working. Matthews asserts that the ALJ erred in assessing the severity of her psychological impairment without any evidence to support this finding and that the Secretary should have ordered a consultative psychiatric examination. The regulations, however, do not require the Secretary or the ALJ to order a consultative evaluation of every alleged impairment. They simply grant the ALJ the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination. 20 C.F.R. § 416.917(a); *Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986) (per curiam); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 214 (6th Cir. 1986).

*Id*. at 424.

The Court next turns to Cash's argument that the ALJ failed properly to consider the effect that her morbid obesity has upon her mental or physical capacity to perform substantial gainful activity and her argument that the ALJ did not determine her proper occupational base or her eligibility for benefits inasmuch as Dr. Ralph Izard's January 2, 2003, findings shed little light on what restrictions Cash would have in performing her past work. The medical records by Dr. Paulk, Cash's treating physician for four years, note no restrictions or limitations on Cash's capacity other than to state once that she was unable to squat more than six inches. *See Baldwin v. Barnhart*, 349 F.3d 549, 558 (8th Cir. 2003).

Significantly, when Dr. Paulk wrote his July 13, 2004, letter – just two weeks after she had complained to him that she was unable to work and needed a slip for Social Security disability – he stated only that Cash had morbid obesity, hypertension, carpal tunnel syndrome, pedal edema and early degenerative joint disease of her knees, that she took Diovan for her hypertension, and that she wear a wrist splint for carpal tunnel syndrome. Dr. Izard diagnosed Cash with degenerative arthritis

of the knees, hypertension and reflux esophagitis. He observed that she would have moderate problems walking and standing due to her knees; no other limitations were noted. Thus, the record was sufficiently developed medically, even as to morbid obesity, as to what restrictions or limitations that Cash had in assessing her residual functional capacity.

The ALJ also explained why he did not find Cash's claims of pain to be fully credible. He discussed the medical findings; the fact that no physician had opined that she was precluded from performing work activity; the effectiveness and her use of non-prescription pain medication;[3] the reason that she had quit working; the inconsistencies in her activities; and the vocational expert's opinion, using the ALJ's specific description of her limitations, that Cash could perform her previous job of monitoring alarm systems. Based on the medical evidence, including the evidence of morbid obesity, his assessment of Cash's subjective complaints, and the vocational expert's opinion, the ALJ found that Cash could perform her previous job at Rock Safe. "Where the claimant has the residual functional capacity to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled." *Lowe v. Apfel*, 226 F.3d 969, 973 (8th Cir. 2000).

The final issue is the characterization of Cash's past relevant work as a surveillance systems or alarm systems monitor by the ALJ in his opinion and the discussion of that terminology during the hearing including the impact on the questioning and opinion of the vocational expert. As the hearing transcript shows, there was not a DOT definition for the job previously performed by Cash. However, the ALJ fully examined and developed the evidence as to exactly what functions Cash performed when she worked for Rock Safe. The vocational expert understood the actual job that

---

[3] *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005).

Cash performed when he addressed the hypothetical posed with the limitations as outlined by the ALJ. The record further reflects that Cash's attorney was permitted the opportunity to question the vocational expert after the ALJ and he did so. Therefore, the evidence supports the ALJ's finding that Cash could return to her past relevant work.

**CONCLUSION**

In sum, the Court finds that there is substantial evidence to support the Commissioner's decision that Cash was not disabled. Accordingly, the Commissioner's administrative decision is hereby AFFIRMED.

IT IS SO ORDERED this 10th day of July, 2007.

J. Leon Holmes

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE